**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

S.M. and E.M. o/b/o B.M.,

    Plaintiffs,

      v.

FREEHOLD REGIONAL SCHOOL
DISTRICT BOARD OF EDUCATION,

    Defendant.

Civil Action No. 22-107 (RK) (RLS)

<u>**OPINION**</u>

<u>**KIRSCH, District Judge**</u>

**THIS MATTER** comes before the Court on a challenge to the decision of the Honorable David N. Fritch, Administrative Law Judge ("ALJ"), concerning the sufficiency of educational services provided by Defendant Freehold Regional School District Board of Education ("the Board" or "Freehold") to B.M., a student entitled to special education and related services. In the administrative proceeding below, the ALJ found that the Board provided sufficient educational services to B.M. and dismissed Plaintiffs' due process petition.

Plaintiffs, B.M.'s parents S.M. and E.M., bring claims on B.M.'s behalf under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*; and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:1-2. Presently before the Court are cross-motions for summary judgment filed by the Board, (ECF No. 51), and Plaintiffs, (ECF No. 52). The Court has reviewed the parties' submissions and decides the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R L. Civ. R. 78.1(b). For the reasons set forth below, with respect to Plaintiffs' IDEA,

Section 504, and ADA claims, the Board's Motion for Summary Judgment is **GRANTED**, and Plaintiffs' Motion for Summary Judgment is **DENIED**. Because judgment is entered for the Board on Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. Therefore, Plaintiffs' NJLAD claims are **DISMISSED** without prejudice for lack of subject matter jurisdiction.

## I.    BACKGROUND

### a.   Statutory Framework

The IDEA provides federal funding to assist states in educating disabled children; the Act requires states that receive federal education funding to provide every disabled child with a free appropriate public education ("FAPE"). *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (citing 20 U.S.C. § 1400, *et seq.*). A FAPE includes both "special education" and "related services." *Id.* (quoting § 1401(9)). "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability"; "related services" are the support services "required to assist a child . . . to benefit from" that instruction. *Id.* (quoting §§ 1401(26), (29)); *see also Ridley Sch. Dist. V. M.R.,* 680 F.3d 260, 268–69 (3d Cir. 2012) (same). To meet its substantive obligations under the IDEA, a school must provide a disabled child with such special education and related services "in conformity with the [child's] individualized education program," or IEP. *Id.* (quoting § 1401(9)(D)).

The IEP is "the centerpiece of the [IDEA's] education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). An IEP is a comprehensive plan prepared by a child's "IEP Team," which includes teachers, school officials, and the child's parents. *See* § 1414(d)(1). It "consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for

reaching the goals by way of the services." *D.S. v. Bayonne Bd. Of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010). A school "must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 399; *see also Endrew F.*, 580 U.S. at 404 ("The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created.").

Parents may challenge the adequacy of an IEP through dispute resolution procedures established by the IDEA. "In New Jersey, this process entails filing a complaint and request for a due process hearing with the New Jersey Department of Education ("NJDOE")." *Estate of S.B. ex rel. Bacon v. Trenton Bd. Of Educ.*, No. 17-7158, 2018 WL 3158820, at *2 (D.N.J. June 28, 2018) (quoting N.J. Admin. Code § 6A:14-2.7(c)). After a due process petition has been filed, the parties are required to attempt to resolve the dispute through a resolution meeting before proceeding to a due process hearing. N.J. Admin. Code § 6A:14-2.7(h).[1] If the resolution meeting is unsuccessful, the case is transmitted to the Office of Administrative Law ("OAL") for a due process hearing before an ALJ. N.J. Admin. Code § 6A:14-2.7(h)(4). After the ALJ issues a final decision, a party may challenge the administrative decision in a district court of the United States. 20 U.S.C § 1415(i)(2)(A). "In the event that a student has been denied a FAPE, a court may award compensatory education to account for the period the student was deprived of this right." *Lauren P. ex rel. David & Annmarie P. v. Wissahickon Sch. Dist.*, 310 F. App'x 552, 554 (3d Cir. 2009) (citing *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 536 (3d Cir. 1995)).

---

[1] Alternatively, the parties may participate in more formal mediation in place of the resolution meeting. N.J. Admin. Code § 6A:14-2.6(a).

b.   Factual Background[2]

B.M. was born on December 30, 1998 and is currently twenty-five (25) years old. (Def's SOF ¶ 1.) S.M. and E.M. are B.M.'s parents; they hold legal guardianship over B.M. pursuant to a February 10, 2017 decision from the Superior Court of New Jersey adjudicating B.M. incapacitated and appointing his parents as legal guardians of his person and estate. (Pls' SOF ¶ 2A; ALJ Dec. at 35.) S.M. and E.M. are seeking compensatory education on behalf of B.M. based on the Board's alleged failure to provide B.M. with a FAPE during the 2017–2018 and 2018–2019 school years.[3]

B.M. is severely developmentally disabled. (Pls' SOF ¶ 1.) According to the IEPs for the 2017–2018 and 2018–2019 school years, B.M. was diagnosed with autistic spectrum disorder. (Pls' SOF ¶ 1A; ALJ Dec. at 35.) B.M. has been classified as eligible by the Board under the category "autistic" for special education and related services. (Pls' SOF ¶ 3.) B.M.'s oppositional behavior has long interfered with his education. (Def's SOF ¶ 6.)

---

[2] The factual background is taken from the Board's statement of material facts in support of its Motion for Summary Judgment, (ECF No. 51-2 ("Def's SOF")), Plaintiffs' statement of material facts in support of their Cross-Motion for Summary Judgment, (ECF No. 52-3) ("Pls' SOF")), and the ALJ's final decision, (ECF No. 51-4 ("ALJ Dec.")).

[3] Plaintiffs also attempt to assert claims for the 2019–2020 school year. (*See, e.g.*, Amended Complaint ("FAC"), ECF No. 48 ¶¶ 91–104.) However, Plaintiffs, who filed their due process petition on April 10, 2019 (during the course of the 2018–2019 school year), do not explain why the Court should consider allegations which arose *after* the petition was filed nor do they provide legal authority for the Court to do so. In fact, Plaintiffs concede that, when reviewing an ALJ decision, the Court is limited to what is contained in the parties' Joint Appendix, or record on appeal, unless one of the parties requests to "expand the record." (ECF No. 52 at 12 (citing 20 U.S.C. §1415(i)(2)(C)(ii)).) They also represent that the parties have agreed not to expand the record in this case. (*Id.*) The ALJ decision confirms that the parties agreed that the school years at issue were the 2017–2018 and 2018–2019 school years. (ALJ Dec. at 46.) The IDEA states that a party "shall have the right to bring a civil action *with respect to the complaint presented* pursuant to this section[.]" 20 U.S.C. 1415(i)(2)(A) (emphasis added); *see also J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 139 (3d Cir. 2022). "In other words, the IDEA provides that a party seeking judicial relief from the decision of state administrative proceedings may do so only to the extent that the party sought such relief in those proceedings." *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 186 n.14 (3d Cir. 2009). The Court is thus constrained to the issues presented before the ALJ: claims arising during the 2017–2018 and 2018–2019 school years.

B.M. was first enrolled at Freehold during the 2012–2013 school year. (Def's SOF ¶ 16.) Before his enrollment at Freehold, B.M. attended the Eden Institute ("Eden"), a local private school for disabled children. (Pls' SOF ¶ 24E.) Once enrolled at Freehold, B.M. continued to attend Eden. (Def's SOF ¶ 19.) However, while attending Eden, B.M. exhibited highly confrontational behaviors at home, especially in the morning, such that "even four adult men could not get [him] onto school transportation." (*Id.*) In February 2013, B.M.'s mother admitted that she had discontinued B.M.'s medications. (*Id.* ¶ 27.) Due to B.M.'s behavioral issues which interfered with his attendance at school, Eden disenrolled B.M. for the 2013–2014 school year. (Pls' SOF ¶ 72A.)

As a result, the Board implemented a comprehensive home-based special education program for B.M. through Applied Behavioral Concepts, Inc. ("New Horizons") for the 2013–2014 school year. (*Id.*; Def's SOF ¶ 21.) However, B.M.'s combative and violent behavior grew worse with in-home instruction. (ECF Def's SOF ¶ 22.) Dr. Frances A. Perrin, Ph.D., BCBA-D, who conducted an evaluation of B.M. in 2017 and served as Plaintiffs' expert during the administrative proceedings, commented that the behaviors B.M. exhibited during in-home instruction were "on the far end of the spectrum of problem behavior" for students with autism, including engaging in "aggression towards the family, towards the staff that were involved and disruptive behaviors, breaking the toilet, the furniture, [and] doors in the home." (*Id.* at ¶¶ 22, 52; *see also* Pls' SOF ¶¶ 26, 26A.) On October 1, 2013, the Board provided B.M. with a psychiatric evaluation conducted by Dr. Rajeswari Muthuswamy, M.D. (*Id.* ¶ 23; *see also* Pls' SOF ¶ 1F.) Dr. Muthuswamy observed a number of troubling behaviors on the part of B.M., including throwing his clothes away, refusing to dress, urinating in the foyer in the same spot where he was sitting, and exhibiting catatonic symptoms. (*Id.* ¶¶ 25–29.)

In January 2014, B.M.'s mother again reported that she had stopped giving B.M. his medications and that B.M. had subsequently been experiencing frequent seizures. (*Id.* ¶ 35.) As a result of the difficulties faced by New Horizons in providing in-home instruction, New Horizons demanded that B.M. be placed in a residential facility outside of Plaintiffs' home. (*Id.* ¶ 40.) Around this time, New Horizons began transporting B.M. to their facility in Neptune for on-site instruction. (Pls' SOF ¶ 72B.) New Horizons provided staffing that would come into the house to assist B.M. in the morning and transport B.M. from his home to their facility. (Def's SOF ¶¶ 41, 43–45; *see also* Pls' SOF ¶ 72A–B.) These services were unsuccessful: B.M.'s oppositional behavior would often prevent him from being placed on school-bound transportation. (*Id.* ¶ 46.) B.M.'s behaviors grew so violent that the police were called to Plaintiffs' home on April 8, 2014, prompting his hospitalization at CentraState Medical Center in Freehold, New Jersey before being transferred to Sheppard Pratt, a psychiatric hospital located in Towson, Maryland, for a few months until his behaviors stabilized. (*Id.* ¶¶ 47–48.)

When B.M. was released from Sheppard Pratt, he was placed at Woods Services ("Woods"), located in Bucks County, Pennsylvania. (Def's SOF 2 ¶ 49–50; ALJ Dec. at 36.) Woods is a private provider of residential and special education programming; B.M.'s placement at Woods was arranged by the New Jersey Department of Children and Families ("NJDCF"). (Def's SOF ¶ 49; ALJ Dec. at 36.) B.M. resided at Woods from 2014 to 2017. (Def's SOF ¶¶ 49–50; ALJ Dec. at 36). During B.M.'s three (3) years in residential placement at Woods, B.M. made substantial progress and his behaviors significantly improved. (Def's SOF ¶ 50; Pls' SOF ¶ 10A; ALJ Dec. at 36.)[4] Notwithstanding B.M.'s success at Woods, in 2017, S.M. and E.M. decided to

---

[4] Citing S.M.'s testimony before the ALJ about B.M.'s progress at Woods, Defendants state that B.M.'s behaviors "stabilized" at Woods for the first time since he was eleven (11) years old. (Def's SOF ¶ 50.). Plaintiffs admit this statement to the extent S.M.'s testimony speaks for itself. (ECF No. 56-1 ¶ 50.) The

move B.M. back to their home for the 2017–2018 school year and withdrew B.M. from Woods. (Def's SOF ¶ 51; ALJ Dec. at 36.) The Board, on the other hand, was hesitant to remove B.M. from residential placement; the Board's position was that B.M. needed to demonstrate an ability to succeed in day placement before returning from Woods. (Pls' SOF ¶ 27C.)

To determine whether B.M. could be successful when removed from residential placement, Plaintiffs secured an independent evaluation from Dr. Perrin on February 2, 2017. (Def's SOF ¶ 52; Pls' SOF ¶ 27C; ALJ Dec. at 36.) This evaluation was paid for by the Board. (Pls' SOF ¶ 28.) Dr. Perrin testified that the evaluation was obtained because "the family was looking to bring [B.M.] home, and the idea was to prepare a report that suggested that he was doing well in his current placement" at Woods, which "would then provide some evidence that this means he may be successful with the right supports in another placement." (Pls' SOF ¶ 27A.) Dr. Perrin testified that he understood B.M. had a long history of non-compliance in transitioning from home to school and that he had not been successfully able to get back and forth to school in the past. (*Id.* ¶ 27B.) Nonetheless, in his report, issued on February 13, 2017, Dr. Perrin opined that B.M. could transition to a day school placement and make progress over time in a "structured environment." (Def's SOF ¶ 52; Pls' SOF ¶¶ 27A–C; ALJ Dec. at 36.) To ensure success, Dr. Perrin recommended that "[s]taffing should be provided for the daily transition from the residence to the school" and that "[s]taffing assisting with the transition should be trained on [B.M.]'s intervention plan and implement prompting strategies consistently." (Def's SOF ¶ 53; ALJ Dec. at 36.) Dr.

---

Board further states that B.M.'s behaviors were "stable" at Woods. (Def's SOF ¶ 51.) Plaintiffs, however, deny this statement. (ECF No. 56-1 ¶ 51.)

The Court notes that Plaintiffs' own Statement of Material Facts quotes S.M.'s testimony in which S.M. observed that B.M. was "behaving well" and "adapt[ing] well" and that "he seemed to be in a good balance" at Woods. (Pls' SOF ¶¶ 9B–C.) Moreover, a February 2017 evaluation of B.M. conducted by Dr. Perrin observed that B.M. made "substantial behavioral progress" at Woods, (ECF No. 51-18 at 4), and the ALJ likewise found that B.M. made "tremendous progress" at Woods, (ALJ Dec. at 36). Based on the record before this Court, the Court accepts the ALJ's finding that B.M.'s behaviors improved while at Woods.

Perrin also recommended that an individual "instructional aide should be provided in the classroom." (ECF No. 51-18 at 4.) However, prior to the start of the 2017–2018 school year, B.M.'s Care Management Organization ("CMO") worker through NJDCF,[5] recommended that B.M. return to residential placement and was working with B.M.'s family to find a group home for B.M. (Def's SOF ¶ 56; ALJ Dec. at 37.)[6] After B.M. moved back home with his family, the Board arranged for B.M. to attend the Shore Center, a day school for students with autism, at the Board's expense, for the 2017–18 and 2018–2019 school years. (Def's SOF ¶ 57; Pls' SOF ¶ 7; ALJ Dec. at 36.)

B.M.'s IEP for the 2017–2018 school year provided that B.M. should receive "door to door" transportation services as well as an individual transportation attendant. (Pls' SOF ¶ 12A; ALJ Dec. at 37.)[7] Once enrolled at the Shore Center, the Board provided B.M. with the following: "(1) an individual personal aide; (2) door to door transportation; and (3) an Individual Attendant while in transit from Plaintiffs' home to the Shore Center." (Def's SOF ¶ 58.) The entity that provided the transportation services had a policy that prohibited the bus from going onto private

---

[5] CMO is an organization, funded by the State of New Jersey, that provides care managers who work with families to connect children and their families with services provided by the State. These services are funded by the State and are separate from the services provided by the school pursuant to a child's IEP. (ALJ Dec. at 6 n.1.)

[6] Plaintiffs deny that their CMO worker recommended that B.M. return to a residential placement while he attended the Shore Center. (ECF No. 56-1 ¶ 56.) However, the Court notes that the ALJ found that the CMO made such a recommendation. (ALJ Dec. at 37.) The Court also notes that Eileen Evarista, a school psychologist who was employed by the Board and was certified as an expert in the area of school psychology during the administrative proceedings, testified as follows: "[P]rior to the school year, [CMO] w[as] working with the family to get to get them in a group home residential placement. When that did not work out, because the family was not accepting of any of the homes that were shown, they worked, continued to work with the family to make suggestions and recommendations for services that could be provided in the home . . . ." (ECF No. 51-8, Trans. at 80:11-81:9.) Based on the record before the Court, the Court accepts the ALJ's finding that the CMO worker recommended that B.M. return to residential placement while attending day school at the Shore Center.

[7] B.M.'s IEP also included a behavioral intervention plan that focused on classroom behavior. (ALJ Dec. at 37–38.)

property. (Def's SOF ¶ 59.) Thus, the transportation aide would meet B.M. at the bus at the bottom of Plaintiffs' driveway. (*Id.*) Generally, for door-to-door transportation services, a parent escorts the student to the bus door, at which point the transportation aide takes responsibility for the child and assists in bringing them onto the bus and accompanying the student to school. (*Id.*; ALJ Dec. at 37.) While B.M. may have been paired with another student on the bus route, he was always transported to the Shore Center with the one-on-one transportation aide. (ALJ Dec. at 37.)

B.M. requires assistance in the morning to prepare him to go to school, including assistance getting dressed, eating breakfast, taking required medications, and getting to the school bus. (*Id.* at 38.) Although B.M.'s mother "had stopped working when B.M. was first diagnosed at age two," after B.M. moved home, she accepted a teaching job in New York for the 2017–2018 school year. (*Id.*) The job required her to leave at 5:30 a.m., and she did not return from work until 7:30 or 8:00 p.m. (*Id.*) B.M.'s father also worked outside of the home, requiring him to leave for work each morning at 7:30 a.m., and he did not generally return until after 3:00 p.m. (*Id.*) Classes at the Shore Center begin at 9:00 a.m. with most students arriving around 8:45 a.m. (*Id.*) The Shore Center is approximately fifteen (15) minutes from B.M.'s home. (*Id.*) Therefore, B.M. would have to board the bus around 8:30 a.m. Due to the parents' work schedules, neither of B.M.'s parents were present in the morning each day for at least an hour before the bus arrived to take B.M. to school. (*Id.* at 52.)[8]

In the fall of 2017, B.M.'s behavioral issues began to deteriorate. (Pls' SOF ¶ 14A; ALJ Dec. at 38.) B.M. was becoming less cooperative getting ready for school in the morning and getting down to the bus. (*Id.*) B.M. would often refuse to get on the bus, resulting in physical

---

[8] The parties do not explain whether B.M. ever successfully boarded school-bound transportation when his parents were absent in the morning, or whether B.M.'s parents ever missed or were late to work to assist B.M. in getting on the bus.

altercations with his parents. (Pls' SOF ¶¶ 14A, 48A–C.) B.M.'s conduct at home escalated, including throwing things and engaging in self-injurious behavior, resulting in B.M.'s hospitalization in December 2017. (Def's SOF ¶ 65; ALJ Dec. at 39.) Two times during the 2017–2018 and 2018–2019 school years, CMO arranged for an aide to come to Plaintiffs' house to assist in taking care of B.M. (ALJ Dec. at 39.) These efforts to provide home-based assistance were unsuccessful. (*Id.*)

Due to problems getting B.M. ready for school in the morning, B.M.'s attendance began to decline. For the 2017–2018 school year, B.M. was absent twenty-nine (29) days and tardy forty (40) days. (*Id.*) However, B.M.'s annual progress report documents that B.M. made "some" or "minimal" progress in each of the defined educational goals. (*Id.* at 40.) The Board provided B.M. with an updated IEP for the 2018–2019 school year which specified that B.M. should continue his education at the Shore Center and be provided with "curb to curb" transportation with an individual aide. (*Id.* at 41.)[9] For the 2018–2019 school year B.M. was absent eighty-six (86) days and tardy thirty-eight (38) days. (*Id.* at 43.)[10] B.M.'s annual progress report also documents that B.M. made "some" or "minimal" progress in each of the defined educational goals. (*Id.* at 43–44.)

In December 2018, B.M. was approved for residential placement at the Bancroft Hardwick Group Home ("Bancroft"),[11] but B.M.'s anticipated move was delayed due to capacity issues at

---

[9] This IEP also included a behavioral intervention plan that focused on classroom behavior. (ALJ Dec. at 41.)

[10] The Court notes that, while the ALJ found that B.M. had eighty-six (86) absences and thirty-eight (38) tardies for the 2018–2019 school year, the ALJ also found that B.M. missed the following number of school days during the months of the 2018–2019 school year: three (3) in September, nine (9) in October, eight (8) in November, fourteen (14) in December, fourteen (14) in January, thirteen (13) in February, thirteen (13) in march, twelve (12) in April, and twenty (20) in May, which totals one hundred and six (106) absences. (ALJ Dec. at 42–43.)

[11] It is uncontested that Bancroft operates both residential facilities and educational services. (*See* ALJ Dec. at 45–46 (referring to Bancroft's Neurohealth School in Mount Laurel, New Jersey and its group home in Voorhees, New Jersey).)

Bancroft. (Def's SOF ¶ 69; ALJ Dec. at 9.) In anticipation of B.M.'s move, the Board identified Burlington County Special Services ("BCSS"), an organization that offers special education services, which, according to the Board, was an appropriate school placement for B.M. while B.M. would be living at Bancroft because it was conveniently located in relation to Bancroft, the special education program was "identical to the program [B.M.] was receiving" at the Shore Center, and it was "the least restrictive public school setting" for B.M. (Def's SOF ¶¶ 70–74.) In December 2018, Eileen Evarista, the school psychologist employed by Freehold, invited Plaintiffs to tour BCSS. (ALJ Dec. at 42.) Plaintiffs declined, stating that they wanted B.M. to also attend Bancroft's school once he moved to the group home at Bancroft. (*Id.*) Residential placement at Bancroft was secured in April 2019. (Def's SOF ¶ 71.)

In April 2019, the Board convened an IEP meeting to discuss B.M.'s move. (*Id.* ¶ 75.) S.M. refused to participate, apparently on advice of counsel as Plaintiffs had filed their Due Process Petition on April 10, 2019 which effected a "stay-put" at the Shore Center. (*Id.* ¶¶ 75–77.) However, while the due process petition was pending, Plaintiffs agreed to tour BCSS, (ALJ Dec. at 44), and on June 27, 2019, Plaintiffs entered into an interim agreement to alter B.M.'s stay-put placement at the Shore Center and to have B.M. placed at BCSS while the administrative proceedings took place. (Def's SOF 2 ¶ 79; ALJ Dec. at 44.) B.M. "aged out and graduated from BCSS in June 2020." (ALJ Dec. at 45.)

    c.   <u>Procedural History</u>

Plaintiffs April 10, 2019 Due Process Petition originally sought B.M.'s placement at the Bancroft school and for the Board to fund the cost of same. (*Id.* at 45.)[12] The hearing on Plaintiffs'

---

[12] Plaintiffs filed a separate due process petition against the NJDCF regarding B.M.'s residential placement. (ALJ Dec. at 46.) However, after the parties reached an agreement to have B.M. placed at BCSS and reside at Bancroft, that petition became moot, and the parties agreed that the remaining issue in the case was whether compensatory education was owed by the Board based on the school's alleged failure to provide

Due Process Petition began on February 25, 2020 and, due to delays imposed by the COVID-19 pandemic, was completed on January 4, 2021. (*Id.*) The hearing took place before an ALJ, the Honorable Dorothy Incarvito-Garrabant. (*Id.* at 3–4.) After the hearing, Judge Incarvito-Garrabant was appointed to the Superior Court of New Jersey, and the matter was reassigned to the Honorable David N. Fritch ("Judge Fritch" or the "ALJ"). (*Id.* at 4.) On October 18, 2021, Judge Fritch issued a final decision in favor of the Board, finding that Plaintiffs were not entitled to compensatory education and dismissing the Due Process Petition. (*Id.* at 62.)

On January 10, 2022, Plaintiff filed this action under the IDEA, appealing the final decision of the ALJ. (Compl., ECF No. 1.) With leave of the Court, (ECF No. 24), Plaintiffs subsequently filed an Amended Complaint adding discrimination claims under Section 504 of the Rehabilitation Act, the ADA, and the NJLAD, (ECF No. 48).

## II.    LEGAL STANDARD

### a.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that the Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "view[] the facts in the light most favorable to the party against whom summary judgment was entered." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The party moving for summary judgment has the initial burden of establishing its right to summary judgment. *See Celotex Corp.*, 477 U.S. at 323. Once the movant meets its threshold burden under Rule 56, the non-moving party must present evidence to establish

---

B.M. with a FAPE during the 2017–2018 and 2018–2019 school years. (*Id.*) Plaintiffs also brought claims against Eastern Camden County Regional School District ("ECCRSD"), which are not at issue in this case, because those claims were dismissed by the ALJ, and ECCRSD was not named as a defendant in this action. (*Id.* at 50.)

a genuine issue as to a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-movant "must do more than simply show that there is some metaphysical doubt as to material facts.").

      b.  Standard in IDEA Cases

The standard of review in an administrative appeal under the IDEA differs from the standard of review governing a typical summary judgment motion. *See M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 F. App'x 404 (3d Cir. 2003).[13] In IDEA cases, district courts are asked to review administrative decisions issued by ALJs; in doing so, district courts exercise "modified *de novo* review." *D.S. v. Bayonne Bd. Of Educ.,* 602 F.3d 553, 564 (3d Cir. 2010). Courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). Courts must give "'due weight' and deference to the findings in the administrative proceedings." *Id.* Accordingly, an ALJ's factual findings are reviewed for clear error. *E.P. v. N. Arlington Bd. of Educ.*, No. 17-8195, 2019 WL 1495692, at *4 (D.N.J. Apr. 1, 2019). Factual findings are considered *prima facie* correct, and if a court declines to accept those findings, the court must explain its reasons. *D.S.*, 602 F.3d at 564; *G.D. ex rel. G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455, 462 (E.D. Pa. 2011). An ALJ's conclusions of law, however, are subject to plenary review. *E.I.H. v. Fair Lawn Bd. of Educ.*, 747 F. App'x 68, 71 (3d Cir. 2018). "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley*, 680 F.3d at 270. "Applying these standards, the

---

[13] The parties agree that the pending motions are not typical summary judgment motions. (ECF No. 55 at 5–6; ECF No. 52 at 11.) They explain that because this case is brought pursuant to this Court's jurisdiction under the IDEA, these motions are more accurately thought of as "motions for judgment on the administrative record," (ECF No. 55 at 5), or, simply, an "appeal," (ECF No. 52 at 11.)

district court may make findings 'based on the preponderance of the evidence[.]'" *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011) (quoting *D.S.*, 602 F.3d at 564).

### III.   DISCUSSION

At the outset, the Court addresses Plaintiffs' threshold argument that the ALJ's factual findings should not be considered *prima facie* correct because testimony was heard by one ALJ before the proceedings were reassigned to another ALJ, who issued the final decision challenged on appeal. (ECF No. 52-2 at 13–14.) Plaintiffs allege that "without explaining the reasons for doing so verbally or in writing, the ALJ opted, in His Honor's sole discretion, not to conduct any more or new Due Process Hearing dates . . . ." (FAC ¶ 82.) However, according to the ALJ decision, it was the parties who declined the opportunity to present additional argument or testimony:

> Following the reassignment of the matter, both parties were contacted by this office to give them the opportunity to re-present any testimony they wished to be heard before the undersigned, however, both parties responded that they did not wish to avail themselves of the opportunity to re-present testimony in this matter and the record was closed upon receipt of that confirmation on August 27, 2021.

(ALJ Dec. at 3.) Nonetheless, the Court finds it immaterial whether it was the ALJ or the parties who decided additional testimony was unnecessary because Plaintiffs have offered no legal authority—and the Court is aware of none—for the proposition that the Court should apply a different standard of review when a due process petition has been reassigned from one ALJ to another. The Court thus gives the ALJ decision due weight, accepting the ALJ's factual findings as *prima facie* correct.

The Court now turns to the parties' central arguments in their cross-motions for summary judgment. The parties' cross-motions are essentially inverses of one another. The Court will thus address each topic in turn.

a. IDEA Claims

Plaintiffs raise three major challenges to the ALJ decision. Plaintiffs argue that the ALJ failed to take into consideration: (1) that the Board did not provide B.M. with home programming, including a supplemental morning aide to help B.M. get ready for school; (2) that the Board did not, in the alternative, provide home instruction; and (3) that the Board did not reevaluate B.M. during the 2017–2018 and 2018–2019 school years to determine how to address B.M.'s behavioral issues that were causing him to be absent from school.

i. *Failure to Provide "Home Programming"*

The first issue before the Court is whether the Board failed to provide the "home-based programming" needed to address B.M.'s issues transitioning to school in the mornings, resulting in a denial of FAPE. As noted above, the IDEA requires schools to provide both special education and related services. In *Cedar Rapids Cmty. Sch. Dist. v. Garret F. ex rel. Charlene F.*, the Supreme Court defined the scope of related services under the IDEA. 526 U.S. 66 (1999). The Court explained that related services under the IDEA encompass those supportive services that "may be required to assist a child with a disability to benefit from special education." *Id.* at 73. These include "services that enable a disabled child to remain in school during the day and provide the student with the meaningful access to education that Congress envisioned." *Id.* (internal quotation marks and citation omitted).

Transportation is a related service that is required when necessary for a student to access and obtain educational benefits. *E.I.H. v. Fair Lawn Bd. of Educ.*, 747 F. App'x 68, 69 (3d Cir.

2018) (citing 20 U.S.C. § 1401(26)(A); N.J. Admin. Code § 6A:14-3.9(a)(7)). Transportation "includes travel to and from school and between schools" and "specialized equipment (such as special or adapted buses, lifts, and ramps), if required to provide special transportation for a child with a disability." 34 C.F.R. § 300.34(c)(16); *see also* N.J. Admin. Code § 6A:27-5 (Transportation services "may include, but are not limited to, special transportation equipment, transportation aides, and special arrangements for other assistance to and from school."). It is undisputed that the Board provided B.M. with transportation and a one-on-one transportation aide. The issue before the Court is whether the Board was required to provide *additional* in-home "transition" aides or services to assist B.M. in the morning.

The ALJ determined that the Board provided B.M. with the necessary transportation services. The ALJ found that B.M. would have to be ready and on the bus around 8:30 a.m. each morning to get to the Shore Center for classes at 9:00 a.m. (ALJ Dec. at 52.) However, S.M. and E.M.'s work schedules required them to leave at 7:30 a.m. and 5:30 a.m. respectively. (*Id.*) The ALJ considered that B.M.'s mother testified that Plaintiffs needed "home programming and support in the morning because [she] just couldn't be there every morning" to assist B.M. (*Id.* at 29.) The ALJ found that what B.M. was lacking during the 2017–2018 and 2018–2019 school years was in-home support from his family to ready him for school each morning. (*Id.* at 52.) He found that the "home programming" that Plaintiffs sought was attributable to S.M. and E.M.'s absence in the morning. (*Id.*) In addition to the demands of their jobs, B.M.'s father admitted that he "just did not want to engage" in prompting B.M. in the morning due to B.M.'s difficult and oppositional behaviors. (*Id.* at 54.) The ALJ also pointed out that Plaintiffs acknowledged that, despite their best efforts, B.M. ultimately required the supervision and structure offered through residential placement, as evidenced B.M.'s return to residential placement in July 2019. (*Id.* at 53–

54.) The ALJ concluded that the Board provided B.M. with the necessary transportation services through his 2017–2018 and 2018–2019 IEPs to offer B.M. meaningful access to education and related services and that the Board's refusal to provide the requested "home programming" did not constitute a denial of a FAPE. (*Id.*)

Plaintiffs argue that the ALJ failed to consider that the services provided by the Board were insufficient because they did not comport with Dr. Perrin's recommendations. As noted above, in his February 2, 2017 evaluation, Dr. Perrin recommended the following:

> Staffing should be provided for the daily transition from the residence to the school to ensure success. Staff assisting with the transition should be trained on [B.M.'s] behavior intervention plan and implement prompting strategies consistently.

(ECF No. 52-2 at 22.) The IEP prepared for the 2017–2018 school year included language that mirrored Dr. Perrin's recommendation: that staffing should be provided "for the daily transition from the residence to the school to ensure success." (*Id.*) Consistent with that recommendation, the IEP provided for "door to door transportation" and a bus with an individual attendant. (Pls' SOF 3 ¶ 12A; ALJ Dec. at 37.) The 2018–2019 IEP again specified that B.M. should be provided with "curb to curb" transportation with an individual aide. (ALJ Dec. at 37.)

Although the IEPs mirrored the language in Dr. Perrin's evaluation, Plaintiffs argue that "transition" assistance should have been read to include supplemental aides or services *before* the school day to assist B.M. in getting ready for school in the home, such as "going to the bathroom, brushing his teeth, and beginning his day." (*Id.* at 52.) Plaintiffs contend that the need for these home-based services should have been clear to Freehold based on B.M.'s past issues transitioning from the home to school at Eden. (ECF No. 52-2 at 24–26.)

The Board argues that the services requested by Plaintiffs are outside the scope of the IDEA because the requested services fall outside regular school hours, are necessitated by the parents'

schedules, not B.M.'s educational needs, and are generally provided by other state agencies, not the Board. (ECF No. 51-1 at 34.) For example, CMO twice provided B.M. with an at-home aide, and has directed Plaintiffs to various services for before and after school care, respite care, and daily living assistance. (ALJ Dec. at 7, 39.)

Plaintiffs, who bear the burden of persuasion as the party challenging the ALJ Decision, do not cite the Court to any cases in which a court considered whether failure to provide before-school aides or services constituted denial of a FAPE. Nor do Plaintiffs cite any authority explaining how the law requiring schools to provide "transportation," 20 U.S.C. § 1401(26)(A), 34 C.F.R. § 300.34(c)(16), N.J. Admin. Code § 6A:27-5, should be read as broadly as Plaintiffs contend. In fact, the section of Plaintiffs' briefs in support of their Cross-Motion for Summary Judgment that pertains to home programming is entirely without citation to legal authority. (*See* ECF No. 52-2 at 21–31.) Likewise, the section in Plaintiff's brief in opposition to Freehold's Motion for Summary Judgment pertaining to home programming contains no case law. (*See* ECF No. 56 at 26–36.) This alone suggests that Plaintiffs have failed to meet their burden on their home programming claim. Nonetheless, the Court will attempt to discern whether Plaintiffs' requested accommodations fall within the scope of the IDEA.

At the outset, the Court is not aware of any cases in this Circuit that have directly addressed whether the services requested in this case constitute related services within the meaning of the IDEA. The Court thus turns to out-of-Circuit authorities to determine whether and how other courts have resolved similar claims.

A district court in North Carolina rejected a similar claim when the parent of a disabled student enrolled the student in a private school since the school district did not have an appropriate in-district program. *Wake Cnty. Bd. of Educ. v. S.K. by & through R.K.*, 541 F. Supp. 3d 652, 659

(E.D.N.C. 2021). The parent sought reimbursement for both the cost of tuition and transportation. *Id.* While the Court awarded reimbursement for both based on the denial of FAPE, it refused to award reimbursement "for the costs of before-and-after school care," finding "no case law which would support reimbursement for care provided outside the typical school day." *Id.* at 670.

Similarly, in *Pierre-Noel on behalf of K.N. v. Bridges Pub. Charter Sch.*, a district court in the District of Columbia rejected parents' request for the school to provide an aide to carry their child from the threshold of their apartment to the bottom of the stairs as part of the IEP's transportation services because the student's mother was unable to do so. 660 F. Supp. 3d 29, 34 (D.D.C. 2023). The District's transportation policy prohibited aides from entering residential apartment buildings or lifting or carrying students. *Id.* The court analyzed the definition of the word "transportation" as used in the IDEA, and in so doing, considered dictionary definitions of the word, the IDEA implementing regulations, the definition of "public school transportation" contained in the ADA, and the customary usage of the word. *Id.* at 34–41. As a result, the court determined that the requested service was outside of the scope of transportation services under the IDEA. *Id.* at 34–41. The Court concluded that the student's mother "could arrange for private lifting services, seek assistance from another public program, move to an ADA-compliant home, or arrange for her husband to carry [the child]. But the IDEA does not oblige the District to carry [the child] up and down residential stairs to the bus." *Id.* at 47. Finding that the IDEA did not mandate the service the plaintiffs sought, the court granted summary judgment for the District on plaintiffs' transportation claim. *Id.* at 32.[14]

---

[14] The court in *Pierre-Noel* also concluded that another consideration counseled against the result sought by the plaintiffs. The Supreme Court has instructed that courts must "view the IDEA from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Thus, a court should ask "whether the IDEA furnishes clear notice regarding the liability at issue in this case." *Id.* In this case, the Court must therefore ask whether the IDEA's transportation

The Court also notes a similar in-District case where a student's IEP provided that the student, who lived at the end of a dead-end street, was to receive door-to-door transportation. *S.W. v. Elizabeth Bd. of Educ.*, No. 21-11510, 2022 WL 807344, at *3 (D.N.J. Mar. 17, 2022). Notwithstanding this provision, the bus would pick the student up at the mouth of the dead-end street because the district had a policy of prohibiting buses on dead-end streets due to the safety concerns associated with having to drive the bus in reverse. *Id.* at *3–4. The plaintiffs brought a challenge based on the district's failure to implement the transportation provision of the IEP. *Id.* at *7. The court determined that the school district did indeed fail to implement the transportation provision of the IEP but that such failure was *de minimis*. *Id.* The court reasoned that the IDEA provides schools with flexibility to implement an IEP—for example, where there are safety concerns at play. *Id.* The court concluded that the school did not deprive the student of a FAPE, granted the school's motion for summary judgment, and denied the plaintiffs' cross-motion for summary judgment. *Id.* at *10.

Although not binding on the Court, these cases persuasively demonstrate that, when faced with similar requests, other courts have rejected same.

The Court also accepts the ALJ's factual finding that the requested services are "in no small part" predicated on Plaintiffs' work schedules. (ALJ Dec. at 52.) In fact, B.M.'s mother admitted that Plaintiffs needed in-home services in the morning because she "just couldn't be there every morning," presumably due to her work schedule. (*Id.*) While the Court is sympathetic to Plaintiffs' professional demands, the touchstone of a school's responsibilities under the IDEA is the child's

---

requirement puts a reasonable government official on notice that entering a disabled student's home and assisting that student in getting ready for school and getting to the bus is required. The Court concludes it does not. *Accord Pierre-Noel*, 660 F. Supp. 3d at 42 (finding that a reasonable government official would not be on notice that lifting and carrying a student down residential stairs is required by the IDEA's transportation requirement.)

educational needs—not the parents' professional needs. *See Gonzalez v. Puerto Rico Dep't. of Educ.*, 254 F.3d 350, 352 (1st Cir. 2001) ("Educational benefit is indeed the touchstone in determining the extent of governmental obligations under the IDEA."). For example, in *Fick ex rel. Fick v. Sioux Falls Sch. Dist.*, a disabled student's mother asked the school district to change her daughter's drop-off address from her home to an after-school day care for the mother's personal reasons unrelated to the student's educational needs. 337 F.3d 968, 969 (8th Cir. 2003). The Eighth Circuit held that a school need not pay for the transportation of a disabled child to a location outside of the students' designated transportation boundaries to accommodate the parents' schedules. *Id.* at 970; *see also Ms. S. ex rel. L.S. v. Scarborough Sch. Comm.*, 366 F. Supp. 2d 98, 100 (D. Me. 2005) ("A request is beyond the reach of the IDEA if it is made for [a parent's] personal reasons unrelated to the student's educational needs.").

Against this backdrop, the Court concludes that Plaintiffs have not met their burden of demonstrating that the ALJ erred in concluding that the Board was not obligated to provide the requested "home programming" services. While Plaintiffs repeatedly assert that the lack of home programming caused B.M. to be either absent or tardy, interfering with his education at the Shore Center, Plaintiffs do not explain why the home programming would have ensured B.M.'s regular attendance. Indeed, B.M. has had a long history of absenteeism, including being disenrolled from his day placement at Eden due to lack of attendance. Moreover, CMO twice provided in-home services to Plaintiffs during the years at issue, both of which were unsuccessful. The ALJ concluded, and this Court agrees, that Plaintiffs' claim that "home programming" would ensure B.M.'s regular school attendance is highly speculative. (ALJ Dec. at 56.) The ALJ thoroughly considered the evidence that B.M. had been successful at Woods; that B.M.'s parents removed B.M. from Woods to attempt a day school placement against Freehold's recommendation; that

Freehold provided transportation, a one-on-one transportation aide, and a one-on-one classroom aide; that B.M.'s parents requested services in the mornings to assist B.M. in getting ready for school; and that B.M.'s parents admitted they requested these services because they could not be present in the morning to assist B.M. in getting ready for school. The Court concludes that the ALJ's decision is supported by credible, substantial evidence in the record.

The Board did not violate B.M.'s entitlement to a FAPE by not providing the "home programming" requested by Plaintiffs. The inquiry in this case is not whether the B.M.'s poor attendance impacted his education at the Shore Center but rather whether the services requested fall within the scope of the IDEA. The Court concludes they do not.

ii. *Failure to Provide Home Instruction*

Plaintiffs also argue—again without citation to any case law—that when B.M.'s behaviors prevented him from attending school, Freehold should have provided home instruction. (ECF No. 52 at 43.) Plaintiffs contend, "even if this Court somehow concludes that attendance at the Shore Center no longer became a viable option for B.M. . . . then this Court has to rule that the Board further or still violated the IDEA by not implementing his IEP in the Parents' home so B.M. could be provided special education programming through a program of home instruction." (ECF No. 52-2 at 43–44.) Defendants counter that Dr. Perrin's evaluation did not recommend in-home instruction and that B.M.'s oppositional behavior only grew worse with in-home instruction. (ECF No. 55 at 20.)

N.J. Admin. Code § 6A:14-4.8(a) provides that "[a] student with a disability shall have his or her IEP implemented through one-to-one instruction at home or in another appropriate setting when it can be documented that all other less restrictive program options have been considered and have been determined inappropriate." N.J. Admin. Code § 6A:14-4.3(b) also provides:

> If it is determined that a student with a disability cannot remain in the general education setting with supplementary aids and services for all or a portion of the school day, a full continuum of alternative placements as set forth in this subsection shall be available to meet the needs of the student. Alternative educational program options include . . . [i]ndividual instruction at home or in other appropriate facilities . . . .

In short, New Jersey's administrative regulations contemplate at home instruction only *when appropriate* for the child and only when *all other less restrictive options* have been considered and determined inappropriate. Plaintiffs neither argue that home instruction was appropriate for B.M. nor that all other less restrictive options had been determined inappropriate. Indeed, the record demonstrates that home instruction was *not* appropriate for B.M. The parties do not dispute that Dr. Perrin observed that, when B.M. was receiving home instruction, his behavior was on the far end of the spectrum of problematic, aggressive, and combative behavior for students with autism. The parties also do not dispute that, when B.M. was receiving home instruction, B.M. engaged in aggression towards family and staff, broke the toilet, furniture, and doors in the family home, refused to put on clothes, urinated in the foyer where he was sitting, and exhibited catatonic symptoms. In short, past attempts at in-home instruction had been singularly unsuccessful. Moreover, Freehold was actively considering another educational placement option during this time. Freehold identified BCSS and, in December 2018, attempted to set up a tour for Plaintiffs to visit the facility. Plaintiffs refused to attend.[15] The Court thus finds that Plaintiffs have not met

---

[15] The Court also notes that, while not raised by either party, the IDEA itself contains a "mainstreaming" requirement, which requires states to establish "procedures to assure that, to the maximum extent appropriate, handicapped children . . . are educated with children who are not handicapped." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (3d Cir. 2000) (quoting 20 U.S.C. § 1412(5)(B) (1994)). The Third Circuit has interpreted this mandate to require that a disabled child be placed in the "least restrictive environment that will provide him with a meaningful educational benefit." *Id.* It is hard to imagine an environment that is *more* restrictive than the in-home instruction requested by Plaintiffs.

their burden of demonstrating that Freehold violated the IDEA by not offering in-home instruction during the 2018–2019 school year.[16]

### iii. *Failure to Reevaluate*

The third issue before the Court is whether the Board failed to reevaluate B.M., resulting in a denial of FAPE. It is undisputed that B.M. was reevaluated on February 2, 2017. This was the most recent evaluation of B.M., and it was conducted by Dr. Perrin and paid for by the Board in anticipation of B.M.'s move from Woods to a day school placement. (ECF No. 52-2 at 18–19.) Plaintiffs take issue with the fact that "neither Ms. Evarista, nor anyone else employed by or hired by the [Freehold School] had observed [B.M.] during his entire tenure at the Shore Center, a period of about 2 whole years." (ECF No. 52-2 at 31–32.) According to Plaintiffs, Ms. Evarista admitted that the Board performed no evaluations upon B.M. during the time he was enrolled at the Shore Center and that no school staff visited the family home during the 2018–2019 school year—the time when he was having the most severe attendance issues. (*Id.* at 32.)

The Board responds that, from B.M.'s first year of enrollment at Freehold in 2012 through the 2019 school year, Freehold offered B.M. four different educational placements—day school placement at Eden, in-home instruction through New Horizons, residential and educational placement at Woods, and day school placement at the Shore Center—demonstrating Freehold's ongoing, active efforts to provide B.M. with a FAPE. (ECF No. 51-1 at 17–18). Freehold also explained that from 2013 to 2019, B.M. was provided with twelve separate assessments. (*Id.* at

---

[16] Plaintiffs also argue that after B.M. was residentially placed in July of 2019, he was entitled to a program "during the Summer of 2019, the first 2 months of the 2019–2020 school year." (ECF No. 525-2 at 33–34; *see also* ECF No. 56 at 40–41.) As noted above, the 2019–2020 school year is beyond the scope of the issues presented in the administrative proceeding before the ALJ and therefore cannot be considered by the Court.

18–19.) Freehold contends that federal and state law require only that disabled students be reevaluated at a minimum every three years. (*Id.* at 16.)

Under 20 U.S.C. § 1414(a)(1), a Local Educational Agency ("LEA" or "school") must conduct an initial evaluation to determine whether a child qualifies under the IDEA for special education and related services. Thereafter, LEAs must conduct reevaluations to ensure that the student continues to need special education and services. 20 U.S.C. § 1414(a)(2)(iii)(B). Such reevaluations must occur "at least once every 3 years, unless the parent and the local education agency agree that a reevaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(B)(ii); *see also* 34 C.F.R. § 300.303(b)(2); N.J. Admin. Code § 6A:14-3.8.

Plaintiffs argue that Freehold "did not evaluate [B.M.] during the 2017–2018 or 2018–2019 school year, thereby ignoring the requirement to reevaluate or evaluate him <u>every 3 years</u> pursuant the IDEA." (ECF No. 56 at 15 (emphasis in original).) The Court is unpersuaded. B.M. was evaluated on February 3, 2017. Plaintiffs filed their due process petition on April 10, 2019. As three years had not yet passed since B.M.'s last evaluation, this argument must fail.

Beyond the triennial reevaluation requirement, reevaluation is required only if the child's parent or teacher requests a reevaluation or "if conditions warrant." N.J. Admin. Code § 6A:14-3.8(a); *see also* 20 U.S.C. § 1414(a)(2)(A) (a reevaluation shall be conducted if requested by the parents or teacher or if the "[LEA] determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation"); 34 C.F.R. § 300.303(a) (same). However, reevaluation may not take place more frequently than once per year unless the parents and school agree otherwise. N.J. Admin. Code § 6A:14-3.8(a); 20 U.S.C. § 1414(a)(2)(B)(i) 34 C.F.R. § 300.303(b)(1).

Plaintiffs do not argue, and there is no evidence before the Court, that B.M.'s parents or one of B.M.'s teachers requested a reevaluation during B.M.'s time at the Shore Center. Instead, Plaintiffs argue that reevaluations should have been conducted more frequently than every three years "if there [was] concern about a particular disabled student." (ECF No. 52-2 at 16 (citing N.J. Admin. Code § 6A:14-3.8(a) and 34 C.F.R. § 300.303).) Because reevaluations may not take place more frequently than once per year, Freehold was not permitted to reevaluate B.M. any earlier than February 3, 2018. Thus, Plaintiffs are asking this Court to find that Freehold violated the IDEA by not reevaluating B.M. sometime between February 3, 2018 and April 10, 2019 (when Plaintiffs filed their due process petition).

Plaintiffs provide no case law or other legal authority interpreting when, absent a request from a student's parent or teacher, reevaluation is nonetheless "warranted" within the meaning of N.J. Admin. C. § 6A:14-3.8(a), 20 U.S.C. § 1414(a)(2)(A), or 34 C.F.R. § 300.30(a).[17] The Court's survey of cases interpreting a schools' responsibilities to conduct *initial* evaluations of a potentially disabled child is instructive. Under the IDEA's "Child Find" provision, "all children residing in the state who are disabled, regardless of the severity of their disability, and who are in need of special education and related services [must be] identified, located and evaluated." 20 U.S.C. § 1412(a)(3). The Third Circuit has interpreted this provision to require schools to evaluate children who are suspected of being disabled within a "reasonable time" after the school is on notice of behavior that is likely to reflect a disability. *Ridley*, 680 F.3d at 273 (citation omitted) ("[T]he school district must be afforded a reasonable time to monitor the student's progress before exploring whether further evaluation is required."). This is not a "bright-light rule"—rather, the

---

[17] "[I]t is not the Court's job to research and construct legal arguments open to parties, especially when they are represented by counsel." *Malek v. Chef's Roll, Inc.*, No. 18-03205, 2019 WL 3854303, at *15 (D.N.J. Aug. 16, 2019).

Third Circuit employs a "case-by-case approach to assess whether the school district's response was reasonable in light of the information and resources possessed by the district at a given point in time." *Id.* at 272 (internal quotation marks and citation omitted).

In this case, the ALJ considered Ms. Evarista's testimony that she did not see attendance issues during the 2017–2018 school year that gave her concern and that B.M.'s parents did not reach out to convene an IEP meeting to address attendance issues in anticipation of the 2018–2019 school year. (ALJ Dec. at 55.) While the ALJ observed that the deterioration of B.M.'s attendance should have caught the attention of the Shore Center and the Board, the ALJ also considered that B.M.'s attendance got significantly worse in December 2018, and by that time, Freehold was "actively seeking alternative placements for B.M." (*Id.*) As noted above, B.M. had been approved for residential placement by December 2018—the Board was anticipating that B.M. would be moving back to a residential facility as soon as capacity allowed and identified BCSS as an appropriate corresponding educational placement. (*Id.*) In April 2019, the Board convened an IEP meeting to discuss B.M.'s needs in anticipation of B.M.'s new residential and educational placement, but Plaintiffs declined to participate. The ALJ also considered that Ms. Evarista testified that, when faced with absenteeism issues, the Board typically engages state agencies such as CMO to work with the family to provide services inside the home to address the causes of absenteeism. (*Id.* at 56.) In this case, CMO was already actively engaging with the family, and twice during the 2017–2018 and 2018–2019 school years CMO attempted unsuccessfully to provide in-home services. (*Id.* at 56.)

The Third Circuit has held that a violation of the IDEA's Child Find obligation did not occur where the district "appeared to be invested in addressing [the child's] needs and provid[ed] appropriate instruction and interventions before rushing to special education identification."

*Ridley*, 680 F.3d at 272. Similarly in the reevaluation context here, the Board was monitoring B.M.'s behavior, helping to facilitate a change in his educational placement, and attempting to convene a meeting to review B.M.'s IEP. In light of these circumstances, the Court finds it reasonable that the Board had not, by April 10, 2019, conducted another reevaluation of B.M. In the absence of contrary legal authority provided by Plaintiffs, the Court finds that Plaintiffs have not met their burden of demonstrating that the Board violated the IDEA by failing to reevaluate B.M. from February 3, 2018 to April 10, 2019.[18]

Having considered each of Plaintiffs' IDEA challenges, the Court affirms the ALJ's decision. Accordingly, with respect to Plaintiffs' IDEA claims, summary judgment is **GRANTED** as to Defendant and **DENIED** as to Plaintiffs.

### b. Section 504 and ADA Claims

Having found that the ALJ did not err in concluding that the Board did not violate the IDEA, the Court now turns to Plaintiffs' claims under the ADA and Section 504 of the Rehabilitation Act.

### i. *Section 504 of the Rehabilitation Act*

Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability with respect to any program or activity receiving federal funding. 29 U.S.C. § 794(a). It also "requires school districts receiving federal funding to provide a FAPE to each qualified handicapped person within the recipient's jurisdiction." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 274 (3d Cir. 2014). Under Section 504, providing a FAPE requires a school district to "reasonably accommodate the needs of the handicapped child so as to ensure meaningful

---

[18] The Court also notes that even presuming that Freehold should have conducted another reevaluation sometime between February 3, 2018 and April 10, 2019, any reevaluation would not have compelled the "home programming" accommodations Plaintiffs seek as the Court finds the requested services fall outside the scope of the IDEA.

participation in educational activities and meaningful access to educational benefits." *Ridley*, 680

F.3d at 280.

"The IDEA and [Section] 504 of the Rehabilitation Act do similar statutory work." *P.P. ex*

*rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009) "[Section] 504's

'negative prohibition' [against disability discrimination] is similar to the IDEA's 'affirmative duty'

and requires schools that receive federal financial assistance to [] provide a [FAPE]." *Ridley*, 680

F.3d at 280 (quoting *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995)). Plaintiffs may bring a

Section 504 claim under the same facts asserted in an IDEA claim. *See Zion M. through Gabrielle*

*M. v. Upper Darby Sch. Dist.*, No. 21-2941, 2023 WL 6299091, at *3 (E.D. Pa. Sept. 27, 2023). A

finding that a school district did not deny a student a FAPE under the IDEA is "equally dispositive"

of claims under Section 504. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 254 n.8 (3d Cir. 2012).

The Court has found that the Board did not deny B.M. a FAPE. The Court therefore also

finds that Plaintiffs' Section 504 claims, which also allege the denial of a FAPE and are based on

the same facts as Plaintiffs' IDEA claims, fail.

ii. *Title II of the ADA*

"[T]he substantive standards for determining liability under the Rehabilitation Act and the

ADA are the same." *Ridley*, 680 F.3d at 283 (3d Cir. 2012) (citing *McDonald v. Com. of Pa., Dep't*

*of Pub. Welfare*, Polk Ctr., 62 F.3d 92, 94 (3d Cir. 1995) ("Congress made clear its intention that

identical standards were to be applied to both Acts.")). The ADA simply "extends the

nondiscrimination rule of Section 504 of the Rehabilitation Act to services provided by any "public

entity" (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. by Hunter*

*v. Mount Lebanon Sch. Dist.,* 95 F.3d 272, 279 (3d Cir. 1996). Because the same substantive

standards apply for Plaintiffs' ADA claims as for Plaintiffs' Rehabilitation Act claims, Plaintiffs' ADA claims must also fail.

Moreover, the Third Circuit has held that "compensatory damages are not available under § 504 of the [Rehabilitation Act] or § 202 of the ADA absent intentional discrimination." *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262 (3d Cir. 2013). For their Section 504 and ADA claims, Plaintiffs seek "compensatory education and/or monetary damages"—they also seek attorney's fees and costs incurred during this litigation. (FAC ¶¶ 110, 113.) While compensatory education is an equitable remedy that awards additional hours of schooling to replace years when the student was not receiving a FAPE, *Lester H. by Octavia P. v. Gilhool*, 916 F.2d 865, 871–73 (3d Cir.1990), Plaintiffs are also seeking monetary damages for which they must demonstrate intentional discrimination. Intentional discrimination in Section 504 and ADA cases requires a showing of at least "deliberate indifference"—deliberate indifference must be a "deliberate choice, rather than negligence or bureaucratic inaction." *Id.* at 263–265; *see also Sch. Dist. of Philadelphia v. Kirsch*, 722 F. App'x 215, 228 (3d Cir. 2018) (same). However, Plaintiffs' claims seem to rest entirely on the alleged *inaction* of the Board. (*See, e.g.*, ECF No. 52 at 19 (contending that the ALJ gave the Board a "proverbial pass for doing essentially nothing"); ECF No. 56 at 15 (the Board "decided to do nothing"); *id.* at 29 (the Board "did literally nothing at all, choosing to be essentially a mere spectator"); *id.* at 30 (arguing that relieving Freehold of its alleged home programming responsibilities would "in effect, 'reward' the Board for its inaction – its decision to do nothing"); ECF No. 64 at 25 ("the Board did nothing and made no effort to do anything")). Plaintiffs do not allege, and the record does not contain evidence of, intentional discrimination as required for compensatory damages claims under Section 504 or the ADA.

Accordingly, with respect to Plaintiffs' Section 504 and ADA claims, summary judgment is **GRANTED** as to Defendant and **DENIED** as to Plaintiffs.

### c. NJLAD Claim

Plaintiffs' remaining claim is brought pursuant to the NJLAD. To adjudicate a case, a federal court must have subject matter jurisdiction based on either federal question or diversity. 28 U.S.C. §§ 1331, 1332; *see also Rockefeller v. Comcast Corp.*, 424 F. App'x 82, 83 (3d Cir. 2011).[19] Here, the Court exercised federal question jurisdiction based on Plaintiffs' claims for relief under the IDEA, Section 504, and ADA. *See Rockefeller*, 424 F. App'x at 83. While the Court has supplemental jurisdiction over Plaintiffs' NJLAD claims under 28 U.S.C. § 1367(a), subsection (c) gives district courts discretion to decline to hear claims over which they otherwise would have supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "The general approach is for a district court to . . . hold that supplemental jurisdiction should not be exercised where there is no longer any basis for original jurisdiction." *Shaffer v. Twp. of Franklin*, No. 09-347, 2010 WL 715349, at *1 (D.N.J. Mar. 1, 2010); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (encouraging federal courts to avoid "[n]eedless decisions of state law"); *Markowitz v. Ne. Land Co.*, 906 F.2d 100, 106 (3d Cir. 1990) ("[T]he rule within this Circuit is that once all claims with an independent basis of federal jurisdiction have been dismissed the case no longer belongs in federal court.").

As discussed above, summary judgment is granted for the Board on Plaintiffs' IDEA, Section 504, and ADA claims. These federal claims formed the basis of the Court's subject-matter

---

[19] While not raised by the parties, district courts have an "ever-present obligation to satisfy themselves of their subject matter jurisdiction." *Liberty Mut. Ins. Co. v. Ward Trucking Corp.*, 48 F.3d 742, 750 (3d Cir. 1995). A court may thus raise the issue of its own subject matter jurisdiction *sua sponte* at any time. *Id.*

jurisdiction to hear this matter, and the NJLAD claim was only properly before this Court pursuant to its supplemental jurisdiction over related claims. Because no federal claims remain, pursuant to § 1367(c)(3), this Court declines to exercise supplemental jurisdiction over the NJLAD claim and accordingly, will not address the parties' arguments as to Plaintiffs' NJLAD claim.

IV.   **CONCLUSION**

For the foregoing reasons, the Board's Motion for Summary Judgment is **GRANTED**, and Plaintiffs' Cross-Motion for Summary Judgment is **DENIED**. Because judgment is entered for the Board on Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. Therefore, Plaintiffs' NJLAD claims are **DISMISSED** without prejudice for lack of subject matter jurisdiction.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: January 16, 2024